

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------------X

TONI CAIAZZO NEFF,

                                        Civil Action No.  18-01826

                        Plaintiff,


                                        **FIRST AMENDED COMPLAINT**

PKS HOLDINGS, LLC;
PURSHE KAPLAN STERLING INVESTMENTS, INC.;
MHC SECURITIES, LLC;                                    **FILED**
WENTWORTH MANAGEMENT, LLC;
J. PETER PURCELL individually;                          **SEP 1 4 2018**
DAVID PURCELL, individually;
LISA LAFOND, individually;                              KATE BARKMAN, Clerk
PETER SHEEHAN, individually;                            By_____Dep. Clerk
ALEX MARKOWITS, individually;
RYAN MORFIN, individually; and,
KATHERINE FLOUTON, individually.

                        Defendants..

---------------------------------------------------------------X

Plaintiff, Toni Caiazzo Neff, as and for her First Amended Complaint[1] against the

defendants respectfully alleges upon information and belief as follows:


## SUMMARY

1. Plaintiff complains pursuant to the Securities and Exchange Act of 1934, 48 Stat. 881, *as*

*amended* by the Dodd-Frank Act, as codified 15 U.S.C. 78a *et seq*.,"), and under

Pennsylvania State Law for Wrongful Termination in Violation of Public Policy, Breach

of Implied Covenant of Good Faith and Fair Dealing and Intentional Infliction of

Emotional Distress. Plaintiff seeks damages to redress the injuries Plaintiff has suffered

---

[1] Plaintiff filed her original complaint on 5/1/2018. Defendants filed a summary of their 12(b) Motion to Dismiss
(ECF No. 7) on August 17, 2018 and filed the full accompanying brief on August 24, 2018 (ECF No. 8). This Amended
Complaint is being filed within 21 days as of right under Fed. R. Civ. Pro 15 (a)(1)(B).

as a result of being unlawfully terminated in retaliation by her employer solely due to her making disclosures that are required or protected by law.

## JURISDICTION AND VENUE

2.  Plaintiff brings her complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

3.  This action also involves a question of Federal Law under the Securities and Exchange Act of 1934 as amended by the Dodd-Frank Act and codified as15 U.S. Code § 78a *et seq*.

4.  This Court has supplemental jurisdiction over the Pennsylvania state causes of action pursuant to 28 U.S.C. §1367.

5.  Venue is proper in this action because Plaintiff was employed by Defendants within the county of Berks in the Commonwealth of Pennsylvania. Additionally, a substantial part of the events giving rise to this claim occurred within the county of Berks in the Commonwealth of Pennsylvania.

## PARTIES

6.  Plaintiff is an adult individual resident of the Commonwealth of Pennsylvania residing in the County of Berks.

7.  Plaintiff has substantial experience in the finance industry. She holds a Master of Business Administration from the Temple University Fox School of Business and a Juris Doctor from the Temple University Beasley School of Law. She has worked as an examiner with the predecessor of the Financial Industry Regulatory Authority (FINRA) at the Philadelphia District Office of NASD Regulation; and as an internal auditor, a

compliance officer, and a Chief Compliance Officer. Plaintiff has obtained a comprehensive familiarity with trading, clearing, operations, finance, accounting, and compliance with laws, rules, and regulations of the Securities and Exchange Commission (SEC), FINRA, and the Municipal Securities Rulemaking Board (MSRB).

8. Defendant PKS Holdings, LLC (hereinafter "Defendant" or "Defendant PKS") wholly owns subsidiary Defendant Purshe Kaplan Sterling Investments, Inc.

9. Defendant Purshe Kaplan Sterling Investments, Inc. (hereinafter "Defendant" or "Defendant PKS") is a registered broker-dealer and FINRA member organization, subject to securities laws and Securities and Exchange Commission ("SEC") rules and regulations, and rules and regulations of FINRA and the Municipal Securities Rulemaking Board ("MSRB").

10. At all times material, Defendant PKS is a business corporation duly existing under the laws of the State of New York with a principal place of business located at 18 Corporate Woods Boulevard, Albany, New York, 12211.

11. At all times material, Defendant PKS operated an office location based out of Plaintiff's home located in the County of Berks in the Commonwealth of Pennsylvania.

12. Defendant WENTWORTH MANAGEMENT, LLC (hereinafter referred to as Defendant or "Wentworth") is a foreign limited liability company, duly formed and existing under the laws of the State of Delaware and has a principle place of business in New York, New York.

13. Defendant MHC SECURITIES, LLC (hereinafter referred to as Defendant or "MHC") is a foreign limited liability company, duly formed and existing under the laws of the State of Delaware.

14. At all times material, Defendant Wentworth by and through Defendant MHC acquired ownership control over Defendant PKS on or around November 30, 2017.

15. At all times material, Defendant J. Peter Purcell (hereinafter referred to as "J. Purcell" or "Defendant J. Purcell") was employed by Defendant PKS as a partner and Chief Executive Officer.

16. At all times material Defendant J. Purcell held supervisory authority over Plaintiff.

17. At all times material, Defendant David Purcell (hereinafter referred to as "D. Purcell" or "Defendant D. Purcell") was employed by Defendant PKS as a partner and General Counsel.

18. At all times material Defendant D. Purcell held supervisory authority over Plaintiff.

19. At all times material, Defendant Lisa LaFond (hereinafter referred to as "LaFond" or "Defendant LaFond") was employed by Defendant PKS as Chief Compliance Officer.

20. At all times material Defendant LaFond held supervisory authority over Plaintiff.

21. At all times material Defendant Katherine Flouton (hereinafter referred to as "Flouton" or "Defendant Flouton") was employed by Defendant PKS as Chief Operating Officer.

22. At all times material Defendant Flouton held supervisory authority over Plaintiff.

23. At all times material, Defendant Peter Sheehan (hereinafter referred to as "Sheehan" or "Defendant Sheehan") was employed by Defendant PKS as an owner and Director of Trading.

24. At all times material, Defendant Sheehan held supervisory authority over Plaintiff.

25. At all times material, Alex Markowits was and is the sole shareholder of Oak Spring Holdings, LLC and sole managing member of MHC Securities, LLC.

26. At all times material, Defendant Markowits held supervisory authority over Plaintiff.

27. At all times material, Ryan Morfin was the Chief Investment Officer for Oak Spring Holdings, LLC and Chief Executive Officer of Wentworth Management Services, LLC.

28. At all times material, Defendant Morfin held supervisory authority over Plaintiff.

29. At all times material, Defendants were Plaintiff's joint and solo employer.

## MATERIAL FACTS

30. On or around March 10, 2014, Defendants hired Plaintiff as a Compliance Officer due to her extensive background and regulatory experience.

31. Defendants hired Plaintiff to work remotely in Berks County in the Commonwealth of Pennsylvania.

32. Defendants have numerous locations in the Commonwealth of Pennsylvania. By means of example, Defendants website lists no less than twenty-five (25) locations at which they conduct business.

33. Plaintiff would frequently conduct audits at Defendants' Pennsylvania locations.

34. Defendants mailed Plaintiff office equipment, including computers, a monitor, virtual private network, modems. Defendants also would routinely send Plaintiff various documents via the United States Postal Service and private courier.

35. Defendants also paid payroll taxes to the Commonwealth of Pennsylvania.

36. Plaintiff has over 20 years of compliance and audit experience in the financial services industry.  Plaintiff began her career as an examiner with the Philadelphia District Office of the National Association of Securities Dealers, Inc. (now known as the Financial Industry Regulatory Authority or "FINRA") where she participated in numerous on-site financial, operational, and compliance examinations of broker-dealers.  She moved from the regulatory side of the industry to the business side where she served in leadership

positions with various firms.  She served as Chief Compliance Officer to several SEC-registered investment advisers, a registered investment company, and a third-party administrator to mutual funds with an affiliated broker-dealer and transfer agent. Plaintiff also has experience as a consultant serving the needs of investment advisers, mutual fund complexes, and broker-dealers.

37. Plaintiff received her Juris Doctor and Master of Business Administration degrees through the dual degree J.D./M.B.A. program administered by Temple University Beasley School of Law and the Fox School of Business and Management.  She holds a Bachelor of Science degree from Drexel University (*cum laude*) in International Area Studies.  Plaintiff also studied comparative civil and criminal law at the University of Athens in Greece.  Throughout her career, Plaintiff has been asked to participate in various industry panels based upon her experience and expertise, the most recent of which was ADISA (the Alternative & Direct Investment Securities Association).

38. During this period, Plaintiff conducted due diligence and research, reviewed new product offerings, administered FINRA Disclosure Review submissions and corresponding Form U4/U5 filings, drafted supervisory procedures, served as the Cybersecurity Compliance liaison with IT, conducted legal and regulatory research, performed cybersecurity audits at branch office locations, and performed various monthly and quarterly compliance reviews, among other duties and responsibilities for Defendant PKS, from her home office located in Berks County in the Commonwealth of Pennsylvania.

39. Plaintiff's employment duties were carried out almost exclusively out of the office location based out of Plaintiff's home.

40. Defendants provided all necessary equipment, materials and supplies to Plaintiff and only required Plaintiff to make occasional visits to their principal place of business located in Albany, New York.

41. Plaintiff provided objective and reasonable analysis for new product offerings, including voicing concerns regarding products that did not withstand scrutiny.

42. By means of example, in or around January 2016, Defendants instructed Plaintiff to review one particular product, GPB Holdings II, LP. After extensive due diligence, Plaintiff provided written support that members of senior management at the sponsor of the product, GPB Capital Holdings, LLC, were utilizing investor funds to monetize personal business interests and did not recommend that this product be approved for the PKS platform.

43. In or around May 2017, Plaintiff was informed by members of the PKS Licensing Department that GPB Holdings II, LP was once again being reviewed and that they had been informed by Defendant Katherine Flouton "to not let anyone know."

44. Upon information and belief, the Licensing Department took this statement to mean not let Plaintiff know, since she had performed the last detailed product review.

45. In or around May and June 2017, the GPB product came up for review again, but this time it was assigned to another employee, Mike McGrath, for completion of the due diligence. Plaintiff called Mr. McGrath to ask why these products were being reviewed again in light of the previous findings. Mr. McGrath was evasive and was noticeably uncomfortable speaking to Plaintiff about this product, or Defendants' decision to review it again.

46. In addition, prior to Defendants' New Products Committee meeting on or around June 26, 2017, another compliance employee informed Plaintiff that it would be best for her to not say anything and not ask any questions about the GPB products at the upcoming New Products Committee meeting.

47. Upon information and belief, Defendants PKS were not willing or able to undergo another FINRA investigation or settlement as they had just finalized a large settlement with FINRA just a few months prior.[2]

48. To effectuate this goal, Defendants continued to implement their pattern of exclusion of Plaintiff, in an effort to insulate questionable product offerings and business practices from her regulatory oversight and questioning.

49. By means of example, in or around July and August of 2017, alternative product sponsors began terminating active selling agreements with Defendant PKS, presumably due to the recent FINRA investigation, resulting settlement, and legal maneuvering undertaken by PKS thereafter.  Because of the large settlement amount paid out and subsequent legal maneuvering of Defendant PKS, increasing numbers of sponsors terminated their active selling agreements with Defendant PKS, and Defendant PKS was desperate to have products on its platform for registered representatives to sell.

---

[2] In or around February 2016, FINRA commenced an enforcement action against Defendant PKS alleging that Defendant PKS had failed to offer the correct breakpoint discounts with respect to sales of various Real Estate Investment Trusts (REITs) to an institutional customer in the amount of approximately $3 3 million, and that the total commissions of these sales in the amount of $11 million were not properly disclosed by the selling registered representative to that customer. In or around February 2017, Defendant PKS settled this enforcement action with FINRA and fully paid the commission restitution and associated costs of approximately $4 4 million.

50. Subsequent to the termination of these active selling agreements, Defendant J. Purcell acted as the requesting representative for a number of new alternative products, including DST products.[3]

51. Plaintiff had been the only employee to conduct due diligence reviews of DST products and had actually researched and trained other PKS employees on DST products.

52. In or around July and August 2017, Defendant Flouton exclusively assigned a new and inexperienced employee to complete a review of a proposed DST product, again in an attempt to shield the product and the status of the selling agreement with the product sponsor from Plaintiff's oversight.

53. Of particular concern was Defendants' forced offering of the Spring Hills Holdings, LLC private placement.

54. After being required to conduct an expedited due diligence review of this private placement offering by Defendant Flouton, and without being informed by Defendant Flouton of any specific registered representative(s) being interested in this product, Plaintiff did not recommend approval of the product at that time,

55. Plaintiff did not recommend approval because the product was newly formed with no history of operations, it was a first-time product for the manager/sponsor (Defendant Markowits), no assets had been raised and only two selling agreements had been executed to date, and the product/offering memorandum had only been effective for three weeks.

56. Despite Plaintiff's concerns and recommendations against approving it and offering it on Defendant PKS' platform, Defendants pushed through the offering. Upon information

---

[3] DST products are Delaware Statutory Trusts, a preferred investment vehicle for passive 1031 exchange investors and direct investors alike.

and belief, the approval of the offering of the Spring Hills Holdings, LLC private
placement was a condition precedent to the subsequent sale of Defendant PKS to
Defendants Markowits, MHC Securities, Defendant Morfin, and Wentworth
Management Services.

57. Defendants however, continued to display discriminatory and personal animus against
Plaintiff for aggressively investigating compliance and regulatory issues.

58. On or around August 17, 2017, Defendants scheduled a meeting between Plaintiff,
Defendant Flouton and Defendant LaFond. At this meeting, Defendants informed
Plaintiff that due to FINRA requirements, the Compliance Department could no longer
perform the internal audit and as a result, Plaintiff was going to be moved to the role of
Internal Auditor/Internal Audit Department. Further at this meeting, Defendants informed
Plaintiff that she was "no longer a member of the Compliance Department" and that she
was not to "cc" Defendant LaFond on any emails.

59. In this new role, Defendants expected Plaintiff to individually complete the internal audit,
a task previously that had been performed by eight to ten individuals, while still retaining
many of her other previous duties. Upon information and belief this was done in an
attempt to encourage Plaintiff to resign her position.

60. As the sole source of income for her family, Plaintiff was forced to accept the change in
position and relied on her previous experience as an internal auditor and as a regulatory
examiner to begin the internal audit duties.

61. At no time did Defendants provide Plaintiff with any written direction or job
requirements for this position, other than telling her she could begin to obtain samples but
could not yet begin the audit.

62. Once in the Internal Auditor role, Defendants' other employees found Plaintiff approachable and began to bring numerous issues to her attention because of her regulatory background and approachability.

63. By means of example, Plaintiff still retained certain duties including Compliance Cybersecurity Liaison with IT. As such, on or around November 1, 2017, a Cyber Incident Identification & Reporting Subcommittee meeting was called which Plaintiff called into. Defendant J. Purcell entered the meeting and asked words to the effect of, "who is on the line?"

64. Upon learning that Plaintiff was on the call, Defendant J. Purcell said words to the effect of "I've told you before…" before abruptly hanging up on Plaintiff. Thereafter, Plaintiff was informed by a Compliance department member that he had been told he was replacing Plaintiff in that role, although Defendants failed to communicate such change to her even after Plaintiff inquired on or around November 1, 2017 about why she had been hung up on. Plaintiff never received an answer to her inquiry.

65. By means of further example, on or around December 15, 2017, Defendants removed Plaintiff from any assignments to conduct Continued Due Diligence of alternative products.

66. In or around November 2017, Defendant PKS transferred a portion of ownership to Defendant Wentworth Management Services, LLC and Defendant MHC Securities, LLC, through and via Defendant Markowits and Defendant Morfin.

67. Upon information and belief, day to day control of PKS was to remain unchanged by the transfer of ownership.

68. On or around January 25, 2018 Defendant Flouton emailed Plaintiff and cc'd Defendant LaFond asking to see the work that had been completed so far on the internal audit. This was despite the fact that in or around August 2017, Defendants had specifically instructed Plaintiff not to "cc" Defendant LaFond on matters regarding the internal audit. Plaintiff was due to present her preliminary findings to the Audit Committee on February 9, 2018.

69. On or around January 28, 2018, Plaintiff contacted Michael Newman, FINRA Senior Regional Counsel in the Department of Enforcement, Woodbridge Office to inform him of numerous concerns that she had. Namely, the attempt to compromise the integrity of her internal audit independence and interfere with her audit investigation, and that in conducting the internal audit, she had uncovered numerous violations of various rules and regulations including but not limited to execution of selling agreements before conducting due diligence; a pattern of quid pro quo with regard to new product approvals; failure to follow internal procedures; self-dealing; suitability and best execution concerns; and failure to supervise.

70. FINRA is organized under the Securities Exchange Act of 1934 to have the capacity to carry out the purposes of the Exchange Act and to enforce compliance by its members and persons associated with its members with the provisions of the Exchange Act. Further it is designed, among other things, to prevent fraudulent and manipulative acts and practices; to promote just and equitable principles of trade; to remove impediments to and perfect the mechanism of a free and open market and a national market system; and, in general, to protect investors and the public interest.

71. By means of further example and not intended to be an exhaustive list, Plaintiff had reasonable belief that Defendant PKS was in violation of the Securities and Exchange

Act, FINRA Rules, Municipal Securities Rulemaking Board Rules, and the Bank Secrecy Act. Plaintiff also raised her concerns with Mr. Newman regarding the email request from Defendant Flouton asking to see the contents of the Audit before the preliminary findings were due to be presented on February 9, 2018.

72. Plaintiff was under a legal duty to report her findings under FINRA Rule 4530.

73. On or around the morning of January 29, 2018, Plaintiff emailed Defendant D. Purcell asking to speak with him in confidence about Defendant Flouton's email of January 25, 2018, Plaintiff's email response thereto, and an article outlining SEC requirements for internal audit independence.

74. Later that day, Plaintiff and Defendant D. Purcell had a telephone conversation during which Plaintiff intended to inform Defendant D. Purcell of the same violations as above and forwarded Defendant Flouton's email, Plaintiff's response and an article outlining SEC requirements for internal audit independence.

75. During this conversation, Defendant D. Purcell abruptly cut you off and stated words to the effect of "that compliance offers, under security laws really only had two choices if they find something problematic; report it or resign."

76. Just two days later, Defendant Flouton called Plaintiff instructing her to return her call by 5:00pm that day. Plaintiff returned Defendant Flouton's call at which time Defendant Flouton informed Plaintiff that Defendants were terminating her position effective immediately with no severance.

77. Defendant Flouton alleged to Plaintiff that the "new owners" of Defendant PKS had made the decision to terminate her.

78. Upon information and belief, Defendant Flouton was referring to Defendant Markowits, Defendant MHC, Defendant Morfin, and Defendant Wentworth.

79. Upon information and belief, Defendants learned of Plaintiff's protected activities.

80. On or around January 31, 2018, Defendants unlawfully terminated Plaintiff in direct retaliation for her participation in protected activities.

81. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

82. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails. Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, losses associated with her damaged reputation in the industry, and other non-pecuniary losses.

83. Furthermore, Plaintiff has experienced severe emotional and physical distress.

84. As Defendants' conduct has been malicious, willful, outrageous, and was conducted with full knowledge of the law, Plaintiff demands Punitive Damages against Defendants.

85. The above are just some examples of some of the retaliation to which Defendants subjected Plaintiff.

86. The Defendants have exhibited a pattern and practice of retaliation.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010- 15 USC § 78u-6(h))

87. Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

88. At all times material hereto, Section 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") was in effect and binding on Defendants it permits individuals who allege discharge or other discrimination to bring an action in United States District Court for relief.

89. Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, *or in making disclosures that are required or protected under SOX, Dodd-Frank, and any other law, rule or regulation subject to the jurisdiction of the SEC (emphasis added).*

90. Plaintiff is a whistleblower within the meaning of Dodd-Frank.

91. Defendants harassed, threatened, discharged and retaliated against Plaintiff, and took other adverse actions against Plaintiff, after Plaintiff made oral and written complaints regarding what she reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints to her employer, by and through its agents and employees, as well as to FINRA.

92. Plaintiff is informed and believes, and thereon alleges that because of her making complaints regarding Defendant's illegal conduct and/or conduct Plaintiff reasonably believed to be illegal, Plaintiff was discharged from her employment and/or otherwise discriminated and retaliated against by Defendant after she had made the aforesaid disclosures and complaints about illegal conduct.

93. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

94. Plaintiff has further suffered and will continue to suffer a loss or earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

95. Defendants' actions constituted a willful violation of the above mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendants to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

96. The conduct of Defendants described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

97. As a proximate result of the actions and conduct described hereinabove, which constitute violations of Dodd-Frank, Plaintiff has been damaged in an amount according to proof at the time of trial, and seeks all relief allowable by law including without limitation double back pay, injunctive and declaratory relief, make-whole relief, civil penalties, litigation costs, expert witness fees and attorneys' fees against Defendant pursuant to Dodd-Frank.

98. Wherefore Plaintiff prays for relief as stated in pertinent part hereinafter.

### SECOND CAUSE OF ACTION
**Wrongful Termination in Violation of Public Policy**
**(Under Pennsylvania State Law)**

99. As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

100.     At all times material hereto, Section 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") was in effect and binding on Defendant. Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, or in making disclosures that are required or protected under SOX, Dodd-Frank, and any other law, rule or regulation subject to the jurisdiction of the SEC.

101.     The aforesaid law is a fundamental policy of the United States of America and the Commonwealth of Pennsylvania.

102.     Plaintiff believes and thereon allege that her whistleblowing, refusing to condone illegal activity, and engaging in protected activity, was or were a motivating factor in Defendants' conduct as alleged hereinabove, including terminating Plaintiff.

103.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; and Plaintiff has suffered and continued to suffer a loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

104.     Defendants' conduct as described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

### THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

105.     As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

106.     Plaintiff and Defendants had an agreement that Plaintiff would be able to perform the duties of an internal auditor in accordance with federal and state regulations and commonly understood business practices, without fear of losing her job, being threatened, and without having her position terminated. The agreement between Plaintiff and Defendants contained an implied covenant of good faith and fair dealing, which obligated Defendants to perform the terms and conditions of the agreement fairly and in good faith and to refrain from doing any act that would deprive Plaintiff of the benefits of the agreement.

107.     Plaintiff has performed all conditions, covenants and promises required on her part to be performed in accordance with the terms and conditions of the agreement.

108.     Plaintiff is informed and believes, and thereon alleges, that Defendants knew Plaintiff had fulfilled, and was ready, willing and able to continue to fulfill all of her duties and conditions under the agreement.

109.     Defendants breached the implied covenant of good faith and fair dealing under the agreement by terminating Plaintiff without good cause.

110.     As a direct, foreseeable and proximate result of Defendants' breach of the implied covenant, Plaintiff has suffered and sustained damages in an amount according to proof.

### FOURTH CAUSE OF ACTION
### For Intentional Infliction of Emotional Distress
### (Under Pennsylvania State Law)

111.     As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

112. Defendants engaged in outrageous conduct towards Plaintiff with the intention to cause, or with reckless disregard for the probability of causing, Plaintiff to suffer severe emotional distress, and with wanton and reckless disregard for the injurious result to Plaintiff, as set forth hereinabove. The conduct set forth hereinabove was extreme and outrageous and an abuse of the authority and position of Defendants. The above-described conduct was intended to cause severe emotional distress or was done in conscious disregard of the probability of causing such distress. This conduct exceeded the inherent

risks of employment and was not the sort of conduct normally expected from an employer. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has sustained and continues to sustain pain and suffering, extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continues to suffer a loss of earnings and her employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

113. Plaintiff is informed and believes and thereon alleges that Defendants and its managing agents, managers, officers, and/or directors committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or oppression, and in conscious disregard of Plaintiff's rights.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants as follows:

1. For compensatory damages, including lost wages, medical benefits and other employment benefits, according to proof;

2. For double back pay with interest;

3. For reinstatement, or in the alternative, front pay as the court deems just and proper;

4. For general, mental and emotional distress damages according to proof;

5. For punitive damages on each cause of action for which they are awardable;

6. For all civil penalties awardable;

7. For an award of interest, including prejudgment interest, at the legal rate;

8. For an award of litigation costs and attorneys' fees as awardable on each cause of action pursuant to Dodd-Frank, and any other available bases;

9. For an injunction ordering PKS to cease and desist its unlawful practices;

10. For costs of suit incurred;

11. For such other and further relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Toni Caiazzo Neff hereby demands a jury trial on all issues so triable.

DATED: September 14, 2018

**DEREK SMITH LAW GROUP, PLLC**

By: _____

J. PATRICK GRIFFIN, ESQ

Derek Smith Law Group, PLLC
1845 Walnut Street, Suite 1601
Philadelphia, PA 19146
(215) 391-4790
(215) 893-5288 (fax)
patrick@dereksmithlaw.com

Attorneys for Plaintiff